UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN SMITH,

      Plaintiff,                         Case No. 19-10330

vs.                                    HON. MARK A. GOLDSMITH

WALLACE E. SMITH, et al.,

      Defendants.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS (Dkt. 120) AND GRANTING**
**DEFENDANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF (Dkt. 140)**

This matter is before the Court on Defendants Wallace E. Smith, Joan E. Smith, Amanda

Menchinger, E&E Manufacturing Corporation, Inc. ("E&E"), E&E Manufacturing of Tennessee

LLC, and JAW Trading Co., Inc.'s motion to dismiss based on a lack of subject-matter jurisdiction

(Dkt. 120) and on Defendants' motion for leave to file supplemental briefing (Dkt. 140).

Defendants contend that the Court lacks jurisdiction over the case because complete diversity does

not exist, in light of evidence demonstrating that Plaintiff Martin Smith is a citizen of Michigan

rather than Kentucky.  The motion to dismiss is fully briefed, and the Court held an evidentiary

hearing on January 12, 2021.  For the reasons that follow, the Court grants Defendants' motion to

dismiss and grants their motion for leave to file supplemental briefing.[1]

---

[1] In their motion for leave to file supplemental briefing, Defendants sought to conduct limited
discovery and to hold an evidentiary hearing.  Mot. for Leave to File Suppl. Br. at 1-2.  Because
the Court held an evidentiary hearing and permitted the parties to submit post-hearing
supplemental briefing, this motion is granted.

## I.  BACKGROUND

This shareholder oppression action involves a dispute between the shareholders of E&E, a closely held corporation.  Martin Smith is a minority shareholder, who owns (individually or through his trust) approximately 48.5% of E&E's outstanding stock, while his brother, Wallace Smith, and Wallace's wife, Joan Smith, are majority shareholders, who together own (individually or through various trusts) the remaining 51.5% of the company stock.[2]  2d Am. Compl. ¶ 1, 58 (Dkt. 105).  Martin principally claims that Wallace and Joan, acting as controlling shareholders and the sole directors of E&E, have "frozen" him out of participating in the company's financial success by approving their own excessive compensation and simultaneously refusing to issue dividends despite E&E's substantial profits.  Id. ¶¶ 2-3, 9-14, 60-61, 150.

Defendants seek to dismiss the action based on a lack of subject-matter jurisdiction.  The asserted basis for jurisdiction in this matter is diversity, under 28 U.S.C. § 1332(a)(1).  Id. ¶ 47.  Martin is alleged to be a citizen of Kentucky while all Defendants are alleged to be citizens of Michigan.  Id. ¶¶ 16-47.  Defendants maintain, however, that the evidence shows that Martin is a citizen of Michigan rather than Kentucky, thereby destroying diversity.

## II.  STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction," as their authority is conferred only by statute and by the Constitution.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  There is a presumption against federal jurisdiction, id., and it is a plaintiff's burden to establish that jurisdiction exists by a preponderance of the evidence, Hertz Corp. v. Friend, 559 U.S. 77, 96 (2010).  Federal Rule of Civil Procedure 12(h)(3) mandates that a court dismiss an action, either sua sponte or on motion by a party, if it "determines at any time that it lacks subject-

---

[2] Because many of the individual parties share the last name Smith, the Court refers to these individuals by their first names.

matter jurisdiction . . . ." The principle has long been established that the court's lack of subject matter jurisdiction may be asserted at any time by any interested party, either in the answer, by motion, or in the form of a suggestion to the court prior to final judgment. See 5B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 1350 (3d ed. 2020).

Motions to dismiss for lack of subject-matter jurisdiction come in two varieties: facial attacks and factual attacks. United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994). In confronting a facial attack, which challenges the sufficiency of the pleadings, "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." Id. But in confronting a factual attack, which challenges the factual existence of subject matter jurisdiction, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. (internal citation omitted). Because the instant motion presents a factual attack, no presumption of truthfulness applies.

### III. ANALYSIS

Where, as here, the asserted basis of jurisdiction is diversity of citizenship, a plaintiff must establish that that the dispute is between citizens of different states, and that the matter in controversy exceeds $75,000 in value. 28 U.S.C. § 1332(a)(1). Under the diversity statute, "there must be complete diversity such that no plaintiff is a citizen of the same state as any defendant." V & M Star, LP v. Centimark Corp., 596 F.3d 354, 355 (6th Cir. 2010). Diversity is assessed on the facts as they existed at time the complaint was filed. Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570-571 (2004). There is no dispute in the present action that Martin has adequately pleaded the amount in controversy, or that all Defendants are citizens of Michigan. What is disputed is Martin's citizenship.

3

The citizenship of an individual for diversity purposes is his or her state of domicile. Napletana v. Hillsdale College, 385 F.2d 871, 872 (6th Cir. 1967). "To acquire a domicile within a particular state, a person must be physically present in the state and must have either the intention to make his home there indefinitely or the absence of an intention to make his home elsewhere." Deasy v. Louisville & Jefferson County Metro. Sewer Dist., 47 F. App'x 726, 728 (6th Cir. 2002). The Sixth Circuit has further clarified that a domicile must be distinguished from a mere residence:

> Generally, an individual's "domicile" is his "true, fixed, and permanent home and principal establishment." It is the place to which he returns whenever he is absent. "Residence," in contrast, requires both physical presence and an intention to remain some indefinite period of time, but not necessarily permanently. Thus, domicile is an individual's permanent place of abode where he need not be physically present, and residence is where the individual is physically present much of the time. An individual consequently may have several residences, but only one domicile.

Eastman v. Univ. of Mich., 30 F.3d 670, 672-673 (6th Cir. 1994) (internal citations omitted).

In evaluating an individual's intent to establish domicile, courts consider a variety of factors, including "affidavits of intention, transfer requests, registration for driver's licenses, opening bank accounts, addressing tax returns, motive for establishing domicile, and other physical facts evidencing that the desire to remain will not expire when the order requiring presence does." Stifel v. Hopkins, 477 F.2d 1116, 1973 (6th Cir. 1977). A party's subjective statement of intent to establish domicile, while given "full and fair consideration," is subject to judicial skepticism and is accorded little weight when contradicted by objective facts or the party's actual conduct. District of Columbia v. Murphy, 314 U.S. 441, 456 (1941); see also Willis v. Westin Hotel Co., 651 F. Supp. 598, 901 (S.D.N.Y. 1986) ("Although intent is crucial to domicile, mere subjective statements of affiliation with a particular state or of intent to make it one's home, of course, cannot suffice for a finding of state citizenship if such statements are belied by objective indicia of actual residence and intent.").

Once domicile is established, there is a widely accepted presumption favoring the continuation of that domicile until a change in domicile is established by clear and convincing evidence. 13E Wright & Miller, Fed. Prac. & Proc. § 3612. The effect of this presumption is to place a heavier burden on a party attempting to show a change in domicile than one who is trying to show retention of an existing one. Id. Thus, some courts have required plaintiffs attempting to establish diversity based on a change in their own or another party's domicile to show that change by clear and convincing evidence. See, e.g., Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000); Kendall v. Delong, No. 3:20-CV-55, 2020 WL 2341159, at *5 (E.D. Tenn. 2020); Ford Motor Co. v. Collins, No. 11–15011, 2011 WL 5877216, at *1-3 (E.D. Mich. 2011).[3]

As will be discussed in the following sections, Martin asserts that he and his wife, Elise Smith, have maintained their domicile in Kentucky since they permanently moved there from Michigan in 2001. Resp. at 13 (Dkt. 133). Defendants, by contrast, contend that Martin is unable to establish by clear and convincing evidence that he acquired a new domicile in Kentucky, and that he continues to be domiciled in Michigan, where he undisputedly lived through 1997 while he was employed by E&E. Defs. Suppl. Br. at 1, 8, 11 (Dkt. 157). The Court evaluates the evidence regarding (i) Martin's ownership of real property, (ii) statements of intent to establish domicile in Kentucky, (iii) his actual presence in Michigan for an extended period of time, (iv) the condition of his residence in Kentucky, (v) unsuccessful attempts to contact Martin at his Kentucky address, (vi) the filing of Kentucky tax returns, and (vii) miscellaneous ties to both Kentucky and Michigan. The totality of the evidence is in equipoise, with neither side of the debate gaining the

---

[3] The Third Circuit has determined that the presumption in favor of an established domicile merely places the burden of production on the proponent of federal jurisdiction. McCann v. Newman Irrevocable Trust, 458 F.3d 281, 289 (3d Cir. 2006). If the party succeeds in carrying that burden of production, "the presumption falls out of the case and the party is required to carry the burden of persuasion by proving that a change of domicile occurred," by a preponderance of the evidence. Id. This view, however, appears to be in the minority.

better part of the argument.  Consequently, the Court determines that Martin has not met his burden of establishing that he changed his domicile from Michigan to Kentucky in 2001, or that he was domiciled in Kentucky at the time he filed the present action, whether the standard is a preponderance of the evidence or clear and convincing evidence.

### A. Evidence Regarding Domicile

#### 1. Property Ownership

Martin grew up and resided in Michigan at least through 1997, while he was employed by E&E.  Martin Aff., Ex. 2 to Resp., ¶ 5 (Dkt. 133-3); Martin Dep. at 11, 15 (Dkt. 151-10); Hr'g Tr. at 48 (Elise) (Dkt. 156).[4]  Martin has owned real estate located in Southfield, Michigan (the "Southfield Property") since the 1970s, and later acquired a condominium located in Lexington, Kentucky (the "Kentucky Property"), which he has owned since 1990.  Hr'g Tr. at 34, 41, 48 (Elise); Elise Aff., Ex. 3 to Resp., ¶ 4 (Dkt. 133-4); Martin Aff. ¶ 8.  The Southfield Property has remained a vacant lot since approximately 2013 or 2014, when the City of Southfield condemned and demolished the house that previously stood on the property.  Hr'g Tr. at 41 (Elise); Martin Dep. at 156-157.  Photographs of the Southfield Property confirm that it is a vacant lot. Photographs, Ex. 4 to Resp. (Dkt. 133-5).  Elise avers that she and Martin own no houses or dwellings other than the Kentucky Property, and that Martin had no intent to acquire additional property when the complaint was filed on February 4, 2019.  Hr'g Tr. at 41-42 (Elise).

#### 2. Declarations Regarding Domicile

Martin and Elise state that they permanently moved to the Kentucky Property in 2001 and have maintained that property as their domicile since that time.  Hr'g Tr. at 34, 42 (Elise); Elise Aff. ¶ 11; Martin Aff. ¶¶ 6-11.  James Miller, Martin's attorney of 25 years, also testified that it is

---

[4] Elise testified during the evidentiary hearing instead of Martin, as Martin was incapacitated after suffering a stroke in April 2020.  See Hr'g Tr. at 32 (Elise); Elise Aff. ¶ 21.  Elise has been appointed Martin's guardian and conservator.  Orders Regarding Conservatorship (Dkt. 118-1).

his "understanding" that Martin and Elise permanently moved to Kentucky in approximately 2000 or 2001.  Hr'g Tr. at 66 (Miller).  However, he did not elaborate on the basis for this "understanding" and does not appear to have personal knowledge of Martin and Elise's purported move.

Although the Kentucky Property is the only residence that Martin currently owns, he acquired the property in 1990, when he undisputedly was domiciled in Michigan.  In support of his position that he permanently moved to the Kentucky Property in 2001, Martin relies entirely on his and Elise's declarations.  He has offered no concrete, objective evidence demonstrating that he began permanently residing at the Kentucky Property in 2001, such as telephone or utility bills or credit card histories showing purchases being made in Kentucky for sustained periods of time.  Further, Martin owned a house at the Southfield Property, where he could have resided until that house was demolished in 2013 or 2014.  Despite Martin's and Elise's representations, a party's self-serving declarations of intent to establish domicile are accorded little weight when contradicted by objective facts or the party's actual conduct.  See Murphy, 314 U.S. at 456.  Here, ample objective evidence undercuts Martin's and Elise's assertions regarding domicile, as described below.

### 3. Physical Presence in Michigan

Contrary to Martin's and Elise's representations that they are domiciled in Kentucky, the evidence demonstrates that they have spent extended periods of time in Michigan.  During that time, they lived in short-term, transient lodgings at hotels and paid regular room rates; they did not acquire any long-term leases or purchase a home.  Hr'g Tr. at 41-42 (Elise); Elise Aff. ¶ 9, 15.  Hotel records indicate that Martin and Elise resided at the Red Roof Inn in Belleville, Michigan, for over a year and a half between November 12, 2015 and July 31, 2017.  Red Roof Inn Records, Ex. A to Defs. Suppl. Br. (Dkt. 157-1).  Martin and Elise later resided at the Magnuson Hotel in

Fowlerville, Michigan, for two and a half years between November 17, 2017 and July 10, 2020. Magnuson Hotel Records, Hr'g Ex. 3 (Dkt. 154). Hiral Patel, an owner of the Magnuson Hotel, testified that they stayed in a standard room and that the hotel offers strictly transient, nightly-based room rates and does not offer long-term accommodations. Hr'g Tr. at 21-24 (Patel).[5]

Martin and Elise acknowledge that they have remained in Michigan for an extended period over the past several years, but nevertheless maintain that they had no intention of changing their Kentucky domicile. Hr'g Tr. at 33-34, 52 (Elise); Elise Aff. ¶ 22; Resp. at 7. Elise offers several reasons explaining that she and Martin were detained in Michigan.

First, she claims that they were visiting her elderly parents. Elise Aff. ¶ 12. However, this explanation is unpersuasive, as Elise does not specify when these visits occurred, how long they lasted, or why they may have been prolonged. Further, Elise's mother passed away in 2003, long before Martin and Elise began residing at the Michigan hotels.[6]

Second, Elise explains that she and Martin remained in Michigan because Martin broke his hip in September 2017, preventing them from returning to Kentucky during his hospitalization and lengthy rehabilitation in Michigan. Hr'g Tr. at 37, 58-59 (Elise); Elise Aff. ¶¶ 13. Again, this explanation is unpersuasive, as Elise offers no details regarding how long Martin's recovery and

---

[5] Although the Magnuson Hotel records indicate the Southfield Property as Martin's address, Patel testified that the address was copied from Martin's driver's license. Hr'g Tr. at 24 (Patel). The Red Roof Inn records indicate the Kentucky Property as Martin's address. See Red Roof Inn Records.

[6] See https://www.rggrharris.com/obituaries/George-Homanick?obId=9964773.

Defendants additionally argue that Elise's father lived in Florida before he passed away in December 2019. Reply at 4 (Dkt. 136). However, they have produced no evidence of that. Defendants cite a website indicating that a living trust in Elise's father's name owns a single-family dwelling in Florida, but that website does not establish whether her father lived in Florida year-round and, if so, when he moved to Florida. See https://perma.cc/ZS34-5HM2.

rehabilitation lasted, nor does Martin adduce support for the implication that he was medically unable to travel back to Kentucky for over a year.

Third, Elise maintains that Martin retained counsel in the fall of 2018, Hr'g Tr. at 33 (Elise), and that they remained in Michigan after filing the present action in February 2019 to be available to attend depositions and court conferences, Elise Aff. ¶ 14. Defendants dispute whether Martin's presence in Michigan was necessary for the litigation, pointing out that Martin has attended only one deposition—in September 2019—and two settlement conferences in November 2019 and March 2020. Reply at 4. The Court agrees that this explanation for Martin's continued presence in Michigan is thin, at best.

Fourth, Martin and Elise were recently prevented from returning to Kentucky because Martin suffered a stroke in April 2020, resulting in his hospitalization and subsequent placement in rehabilitation for weeks afterward. Hr'g Tr. at 59 (Elise); Elise Aff. ¶¶ 16, 18. Following Martin's stroke, Elise obtained Medicare coverage for him through a Social Security office in Hazard, Kentucky. Hr'g Tr. at 43 (Elise); Elise Aff. ¶ 17. She also obtained a full guardianship and conservatorship over Martin due to his incapacitation. Hr'g Tr. at 32 (Elise); Elise Aff. ¶ 19; Orders Regarding Conservatorship (Dkt. 118-1). The conservatorship proceedings took place in Michigan because Martin and Elise were present in Michigan at the time of Martin's stroke. Elise Aff. ¶ 20. And while the conservatorship petition listed a post office box in Howell, Michigan, as Elise's mailing address, it also indicates that Martin resides at the Kentucky Property. See Probate Petition, Ex. O to Mot. (Dkt. 120-16). Moreover, Elise asserts that she is "working toward" having similar orders entered in Kentucky. Id. Presently, Martin and Elise have returned to Kentucky and have resided there since at least September 18, 2020. Id. ¶¶ 20, 24; Hr'g Tr. at 44 (Elise).

Martin's treatment and rehabilitation following his stroke are well documented in the record, see Mot. to Stay (Dkt. 110); Mot. for Extension of Stay (Dkt. 118), and serve as a legitimate

basis for Martin's and Elise's continued presence in Michigan between April 2020 and September 2020.  In the Court's view, the fact that Elise initiated conservatorship proceedings in Michigan does not signify Martin's intent to maintain a domicile in Michigan; rather, it reflects the realities that Martin was receiving treatment in Michigan and that Elise likely needed legal authority to make medical decisions on behalf of Martin.  Likewise, the fact that Elise listed a Michigan post office box as her mailing address reflected nothing more than her presence in Michigan at the time of Martin's stroke.

Nor are Martin's application for Medicare in Kentucky or statement of residence on the conservatorship petition relevant to the Court's determination of domicile.  "[T]he relevant time for determining the existence of a domicile at a particular location for purposes of diversity of citizenship jurisdiction is at the time that suit is commenced by the filing of the complaint."  13E Wright & Miller, Fed. Prac. & Proc. § 3612.  Elise applied for Martin's Medicare benefits and filed the conservatorship petition well after the complaint was filed.  Moreover, these events took place after the challenge to Martin's domicile was raised, rendering them unreliable indicators of domiciliary intent.

In summary, the evidence demonstrates that Martin and Elise resided in Michigan almost continuously between November 12, 2015 and July 10, 2020—a duration of over four and a half years.  The only persuasive explanation for their extended stay in Michigan is Martin's medical treatment and rehabilitation following his stroke, between April 2020 and September 2020.  This leaves a balance of four years and two months spent in Michigan, for which no convincing justification has been offered.  This extended period of physical presence in Michigan cuts against Martin's and Elise's representations of maintaining a domicile in Kentucky.

### 4.  Maintenance of the Kentucky Property

In support of her assertion that she and Martin always intended to return to Kentucky, Elise asserted that they have maintained the Kentucky Property during their prolonged absence. Hr'g Tr. at 35 (Elise). According to Elise, she and Martin paid property taxes, homeowners insurance, and utilities for the Kentucky Property during the time they spent in Michigan. Id.; Elise Aff. ¶ 6. Additionally, in 2014, they hired a contractor to replace the roof and the wooden deck, and to make numerous other repairs such as replacing shutters and damaged siding—a project totaling over $18,000. Superior Invoice, Hr'g Ex. 2 (Dkt. 151-2). Four invoices dated in 2016, 2017, and 2019 demonstrate that they also hired a landscaping company to perform work such as spreading mulch, trimming trees and bushes, cleaning gutters, and pressure washing the deck. Two Brothers Invoices, Hr'g Ex. 1 (Dkt. 151-1). While one work invoice reflects a total balance of $200, the other three invoices range from $1,175 to $1,836.70. Id. Elise explained that the landscaping work is part of the standard annual maintenance she and Martin have performed at the Kentucky Property. Hr'g Tr. at 36 (Elise). According to Elise, she and Martin are planning to make additional home renovations and are staying in temporary lodgings in Kentucky while those are being made. Id. at 40, 44-45 (Elise).

When questioned whether this home maintenance was completed in response to letters and complaints from the condominium association, Elise responded, "[N]ot all of that," implying that at least some of the maintenance was required by the association. Id. at 54 (Elise). She specifically alluded to a problem with the roof shingles, which the association required to be repaired. Id. Elise further denied having been fined by the association for failing to maintain the Kentucky Property, but admitted that the association would send letters when maintenance needed to be performed. Id. at 53 (Elise). Wallace further testified that the association contacted him sometime between 2005 and 2010, in an effort to reach Martin because the association required access to the Kentucky Property to repair damage to the roof. Id. at 84-85 (Wallace).

David Wihry, Martin's next-door neighbor, testified regarding his observations of the Kentucky Property after he moved into his condominium in November 2017. Wihry Dep. at 6 (Dkt. 151-10). According to Wihry, he never saw Martin or Elise at the property, never observed any lights on at the property, and never observed any vehicles at the property between November 2017 and March 2019. Id. at 6-7. Between March 2019 and December 14, 2020, the date of his deposition, Wihry saw Martin and Elise at the Kentucky Property only once, in the summer of 2020. Id. at 8-9. Wihry stated that Martin and Elise spent several hours at the property over the course of a weekend and that they accepted delivery of a van that has remained parked in the same spot since that time. Id. Wihry testified that, since that weekend, he has seen no indication that the Kentucky Property is occupied. Id. at 12. Finally, Wihry testified that he personally observed a dead snake in one of the windowsills of the Kentucky Property while he was having some work performed on his own unit. Id. at 17-18.

Wallace also testified regarding the condition of the Kentucky Property, which he visited in April 2020 as Wihry's guest at the condominium community. Hr'g Tr. at 81 (Wallace). In Wallace's estimation, the Kentucky Property was uninhabitable and appeared abandoned. Id. at 82. Wallace reported that the yard required maintenance and that there were many dry patches on the lawn. Id. at 85. When he looked through the windows, he observed dust and cobwebs in the windows, mold growing in the kitchen, and grocery bags piled on the kitchen counters. Id. at 85-86. Wallace also observed that a wooden board had been placed over a portion of the garage door that had "rotted out," but that mold was growing on the wooden board. Id. at 86.

Wallace recorded a video of the Kentucky Property, which was submitted to the Court in the traditional manner. Video, Ex. D-1 to Mot. The video was recorded from the exterior of the condominium but captures shots of the interior through the windows. Although the video demonstrates that the Kentucky Property is furnished with Martin and Elise's belongings, it is

generally consistent with Wallace's description.  Mold is visible on the garage door; mold and cobwebs cover the windowsills; paper bags, papers, and other belongings litter the kitchen table and countertops; and what appears to be clothing is strewn over the bannister of the stairway. While it is abundantly clear from the video that the Kentucky Property is filthy and has been neglected for some time, whether it is "uninhabitable," as Wallace maintains, cannot be determined from the video.

Even assuming that Martin and Elise paid homeowners insurance, property taxes, and utilities for the Kentucky Property—representations for which Martin produces no supporting documentation—the maintenance they have performed on the property appears to have been required by the association.  The fact that the association took action to compel this maintenance, even going so far as attempting to gain access to make its own repairs, indicates that Martin and Elise neglected the Kentucky Property to such a degree that it fell into a state of significant disrepair.  This conclusion is only bolstered by Wallace's testimony and the video.  Further, the limited maintenance performed was clearly insufficient to address the deterioration documented in the video.  Ultimately, Martin and Elise's neglect of the Kentucky Property contradicts their assertions that the property was their domicile and where they intended to permanently reside.

### 5.  Undeliverable Mail

As further evidence that Martin is not domiciled in Kentucky, Defendants have produced a least nine letters sent to Martin at the Kentucky Property between 2003 and 2008 that were returned as undeliverable.  Returned Mail, Ex. B to Reply (Dkt. 136-3).  Most recently, Wihry contacted defense counsel to inform them that a FedEx package they sent to the Kentucky Property was not received "because there is nobody living at that address."  3/29/20 Email, Ex. C to Mot. (Dkt. 120-4).  Defendants are not alone in their inability to reach Martin by postal mail, as the Internal Revenue Service sent Wallace a request for information in an effort to locate Martin in

April 2015.  IRS Request, Ex. C to Reply (Dkt. 136-4).  Wallace responded to the inquiry by indicating the Kentucky Property as Martin's latest address and indicating that his telephone number was unknown.  Id.

Between 2005 and 2015, William Heritage, an attorney representing Defendants, sent several communications to Martin and Elise, Miller, and Martin's father-in-law noting that mail sent to the Kentucky Property was returned as undeliverable and requesting updated contact information.  9/19/05 Letter, Hr'g Ex. 6, a PageID.5993 (Dkt. 151-6); 6/18/09 Letter, Hr'g Ex. 6, at PageID.5994 (Dkt. 151-6); 8/31/15 Email, Hr'g Ex. 13 (Dkt. 151-5).  Miller testified that he instructed Defendants to send Martin's mail to Miller's office instead of the Kentucky Property, and that he regularly accepted delivery of E&E's financial reports to be forwarded to Martin.  Hr'g Tr. at 74-75 (Miller).  Communications dating between 2016 and 2018 reflect that Heritage indeed sent E&E's financial statements to Miller.  Heritage Emails, Hr'g Ex. 6, at PageID.5995-5997 (Dkt. 151-6).  Although Defendants continued to incorporate the address of the Kentucky Property in their communications to Martin—and although Wallace responded to the IRS inquiry by providing the address of the Kentucky Property—Wallace testified that this was the only address Defendants had on file for Martin.  Hr'g Tr. at 97-98 (Wallace).  Defendants did not consider the Kentucky Property to be Martin's permanent address and did not send the communications to that address—they instead directed the letters to Miller.  Id. at 95-96, 104.

Martin attributes the undeliverable mail to his strained relationship with Wallace and resultant desire to avoid contact with Defendants.  Pl. Suppl. Br. at 2.  Wallace acknowledged during his testimony that for many years, Martin has made no effort to communicate with him and has not been receptive to Wallace's efforts to communicate.  Hr'g Tr. at 89 (Wallace).  However, it is unclear why this breakdown in the brothers' relationship would impact Martin's receipt of business-related mail primarily sent by Defendants' attorneys and accountants, as distinguished

from personal overtures by Wallace.  Nor does the undelivered mail reflect that it was delivered but unwanted—for example, by bearing Martin's handwritten notation of "return to sender."  See Returned Mail.  Instead, the post office indicated that the mail was either "unclaimed" or that delivery was attempted but that the addressee's forwarding address was not known.  See id.  The IRS was similarly unsuccessful in contacting Martin by mail directed to the Kentucky Property.

These numerous unsuccessful attempts to reach Martin by mail—which span from 2003 through 2015—indicate that he did not reside at the Kentucky Property and, therefore, weigh against a finding that Martin was domiciled in Kentucky.

### 6. Tax Returns

As evidence of his purported domicile in Kentucky, Martin notes that he filed state tax returns in Kentucky for tax years 2009 through 2018.  Tax Returns, Ex. 6 to Resp. (Dkts. 133-7, 133-8).  On both his state and federal returns, he listed the address of a Kentucky post office box that Martin has maintained for the past ten years.  Id.; Hr'g Tr. at 43-44 (Elise).

Defendants note, however, that while these returns were filed for tax years 2009 through 2018, they were delinquent and were all prepared on May 3 or 4, 2019, see Tax Returns, shortly after the Court ordered Martin to file an amended complaint sufficiently establishing jurisdiction on March 25, 2019, see 3/25/19 Order (Dkt. 18).[7]  As discussed above, such activities occurring after action commenced fall outside the relevant timeframe for determining domicile for the purpose of establishing diversity jurisdiction.  See 13E Wright & Miller, Fed. Prac. & Proc. § 3612.  Additionally, the fact that the tax returns were filed after the challenge to Martin's domicile was

---

[7] Defendants further note that although Martin's accountant mailed the delinquent returns to Kentucky in late 2018, it appears that Martin did not receive them—in June 2019, Miller resent the returns to Martin's post office box in Howell, Michigan, with instructions to sign and file the returns as soon as possible.  Defs. Suppl. Br. at 4-5 (citing 6/17/19 Letter, Hr'g Ex. 11 (Dkt. 152-8)).

raised renders them unreliable.  Consequently, the tax returns do not support Martin's position that he was domiciled in Kentucky at the time he filed the complaint.

### 7.  Miscellaneous Connections to Kentucky and Michigan

Martin highlights several additional indications that he maintains his domicile in Kentucky. First, Martin maintains an account with Whitaker Bank in Lexington, Kentucky, id. at 42 (Elise), where Miller instructed Defendants in November 2001 to send payments and distributions from Martin's interest in E&E, 11/13/01 Letter, Hr'g Ex. 5 (Dkt. 152-2).  According to Miller, Martin has never changed his instructions on where these payments should be sent.  Hr'g Tr. at 70 (Miller). Second, Martin indicated on a life insurance application that the Kentucky Property was his home address, Life Insurance Application, Ex. 3 to Pl. Mem. Regarding Diversity Jurisdiction (Dkt. 21-4), and he signed an amendment to a life insurance policy in Lexington, Kentucky, on December 10, 2001, Amendment to Application, Ex. 2 to Pl. Mem. Regarding Diversity Jurisdiction (Dkt. 21-3).  Third, a state court in Kentucky recently appointed John Norman, a Kentucky-based attorney, as the successor trustee over Martin's trust on January 12, 2021.  See Order Appointing Successor Trustee, Ex. C to Pl. Suppl. Br. (Dkt. 160-4).  Again, however, this final fact is neither relevant nor reliable, as it took place after Martin initiated the action and after Defendants challenged his domicile.

Defendants rebut these ties to Kentucky by highlighting a variety of connections Martin maintains with Michigan.  First, in spite of purportedly moving to Kentucky twenty years ago, Martin continues to maintain a Michigan driver's license, last renewed on December 15, 2017, that lists the Southfield Property as his address.  Driving Record, Ex. L to Mot. (Dkt. 120-13). Second, Martin owns two vehicles registered in Michigan.  A 1997 GMC Savana has been registered to Martin, at his Southfield Property address, since May 16, 2014.  Savana Registration, Ex. M to Mot. (Dkt. 120-14).  Another vehicle has been registered to Martin in Michigan since

March 21, 2013.  Vehicle Registration, Ex. N to Mot. (Dkt. 120-15).  Third, Martin is represented by Miller, a Michigan-based attorney, and hires Michigan-based accountants.  See 6/17/19 Letter, Hr'g Ex. 11 (Dkt. 152-8) (indicating Miller's office address in Grosse Pointe, Michigan); Hr'g Tr. at 51 (Elise) (noting that accountant Randall O'Keefe was based in metro Detroit, while accountant Paul Ward was based in Livonia, Michigan).

Any support Martin might find in maintaining a Kentucky bank account and in his representations on his life insurance applications is firmly counterbalanced by Defendants' evidence that he maintains a Michigan driver's license and Michigan vehicle registrations.  The Court credits Martin's assertion that he retained Miller as his attorney and O'Keefe as his accountant based on their longstanding history, see Hr'g Tr. at 57 (Elise), and retained Michigan-based accountant Ward on Miller's recommendation, see Hr'g Tr. at 72 (Miller) (stating that he referred Martin to Ward because he only knows accountants in Michigan).  But the Court rejects Martin's argument that his failure to obtain a Kentucky driver's license and to register his vehicles in Kentucky is the product of mere procrastination.  Pl. Suppl. Resp. at 11; Hr'g Tr. at 50 (Elise) (stating that Martin retained a Michigan driver's license and Michigan vehicle registrations because they had two homes for a long period of time).  A twenty-year duration of procrastination, however, simply strains credulity.

### B.  Totality of the Circumstances

At the heart of this dispute, and complicating the Court's determination of domicile, is the fact that Martin has lived an unorthodox and unusually transient lifestyle.  Much of Martin's conduct—such as residing at hotels for years while paying standard nightly rates, failing to file federal and state income tax returns for roughly a decade, and permitting his house to be condemned—is highly unusual.  The natural consequence of this unorthodox lifestyle has been to create objective indicia undercutting Martin's and Elise's representations of their intent to establish

a domicile in Kentucky. But caselaw is clear that domicile must be established by reference to the totality of the evidence, and that subjective statements of intent do not serve to establish domicile when those statements are contradicted by the objective evidence. See Willis, 651 F. Supp. at 601.

In evaluating the totality of the circumstances, the Court finds that the objective evidence favoring a finding that Martin is domiciled in Kentucky is evenly counterbalanced against the evidence that he is domiciled in Michigan. Indications of domicile in Kentucky include the facts that Martin owns only one residence, located in Kentucky; resided exclusively in transient lodging while in Michigan; pays homeowners insurance, property taxes, and utility expenses for the Kentucky Property; and maintains a bank account in Kentucky. Other factors favor a finding of domicile in Michigan—Martin has resided in Michigan for the past four and a half years, if not longer; offers no valid justification for the majority of his protracted stay in Michigan; maintained the Kentucky Property in a state of disrepair and performed maintenance on the property only at the behest of the condominium association; is unreachable by mail sent to the Kentucky Property; and continues to maintain a Michigan driver's license and Michigan vehicle registrations. Because the scales do not tip in favor of either conclusion, Martin has failed to carry his burden of establishing diversity by a preponderance of the evidence, let alone establishing a change in his domicile from Michigan to Kentucky by clear and convincing evidence. See Gjinaj v. Ashcroft, 119 F. App'x 764, 775 (6th Cir. 2005) (the preponderance of the evidence standard requires that the party bearing the burden "make the scales tip slightly in its favor").

To support his claim of diversity, Martin likens the facts of this case to those presented in several other cases, including Willis—in which the plaintiff sought to establish diversity jurisdiction by showing that she was domiciled in Florida, whereas the defendants argued the plaintiff was a non-diverse citizen of New York. 651 F. Supp. at 599-600. It was undisputed that the plaintiff was a citizen of Florida until 1977, at which point she relinquished her Florida

apartment and began living exclusively in luxury hotels. Id. at 600. Nevertheless, the plaintiff "continued to pay taxes as a Florida citizen . . . , maintained a Florida mailing address (a post office box), and kept up various other ties to the state such as storing her furniture there, using a Florida stockbroker, lawyer and accountant, and having a Florida bank account." Id. For the two years preceding the filing of her complaint, the plaintiff lived at a hotel in New York City and maintained two bank accounts, a safe deposit box, and a brokerage account with New York banks. Id. Crediting the plaintiff's assertions that her stay in New York was prolonged as a result of health concerns and that she intended to return to Florida, the court found that the defendants failed to carry their burden of showing that the plaintiff changed her domicile to New York. Id. at 604. Accordingly, the court found the plaintiff to be a citizen of Florida. Id.

Willis is readily distinguishable from the present action. Since there was no dispute in Willis that the plaintiff was originally domiciled in Florida, the burden was on the defendants, as the opponents of diversity jurisdiction, to establish that the plaintiff had changed her domicile. Here, by contrast, the burden is on Martin, the proponent of federal jurisdiction, to establish his diverse citizenship by a preponderance of the evidence and to show that he changed his domicile from Michigan to Kentucky in 2001 by clear and convincing evidence. For the reasons discussed above, he has not met either burden. Further, the plaintiff in Willis offered a legitimate justification for her prolonged visit to New York, whereas Martin has not adequately explained the reason for his extended stay in Michigan before his stroke in April 2020.

Next, Martin cites Edick v. Poznanski, 6 F. Supp. 2d 666, 667 (W.D. Mich. 1998), in which the plaintiff claimed that the defendant was a diverse citizen of Illinois while the defendant claimed she was a non-diverse citizen of Michigan. The defendant maintained residences in Illinois and Michigan, and her routine involved commuting to Illinois at the beginning of each week, working four days while staying in Illinois, and then commuting back to her residence in Michigan. Id. at

669. She maintained her only bank account in Illinois, received mail at her Illinois address, obtained professional services from doctors and accountants in Illinois, and filed her taxes in Illinois. Id. However, the defendant stated that she intended to change her domicile from Illinois to Michigan, as manifested "in her actions to obtain a Michigan driver's license, register her car in Michigan, purchase Michigan insurance for her car, begin voting in Michigan, and claim the Michigan homestead exemption for the Michigan property." Id. at 669-670. Additionally, she reduced the amount of time she spent working in Illinois. Id. at 670. Given the totality of the circumstances, the court found that the plaintiff failed to show by a preponderance of the evidence that the parties were diverse. Id.

A similar outcome was reached in Art Van Furniture LLC v. Zimmer, No. 19-CV-10880, 2019 WL 2433245 (E.D. Mich. June 11, 2019). There, the parties disputed whether one of the defendants was a diverse party domiciled in Florida or New York, or a non-diverse party domiciled in Michigan. Id. at *1. The defendant in question stated that his family and permanent home were fixed in Michigan, where he was registered to vote, filed taxes, maintained a driver's license, and registered three of his four vehicles. Id. at *2. During the week, he travelled to and resided at an apartment he leased in Florida, as his new job required him to be present in Florida. Id. at *2-3. Further, he owned real estate in New York, where he lived and paid taxes before moving to Michigan. Id. at *2. The court found that the defendant was domiciled in Michigan, and that the plaintiff failed to establish by a preponderance of the evidence that he was domiciled in either Florida or New York. Id. at *3.

Again, the present action is distinguishable from Edick and Zimmer. In Edick, the defendant adduced objective evidence consistent with her stated intent to change her domicile to Michigan. 6 F. Supp. 2d at 669-670. The court noted that her ties to Illinois were of a purely business nature and found them to be insufficient indications of intent to establish a permanent

20

domicile.  Id. at 670.   And in Zimmer, the defendant likewise supported his declarations of Michigan citizenship through objective evidence, while his ties to Florida were merely business-related.  2019 WL 2433245, at *3.  Here, the evidence of Martin's intent to establish domicile in Kentucky is far less clear cut, and it cannot be said that his ties to Michigan are purely the result of his business connections within the state.

Finally, Martin compares the present case to the state-court decision in In re McKinley's Estate, 337 A.2d 851 (Pa. 1975).  In McKinley, the proponents of a decedent's estate attempted to establish jurisdiction in a Pennsylvania probate court by showing that the decent was domiciled in Pennsylvania.  Id. at 852.  The decedent had undisputedly been domiciled in Florida but was detained in Pennsylvania during a visit due to deteriorating health.  Id. at 853.  Believing that her health prevented her from returning to Florida, the decedent directed that her will and assets be sent to Pennsylvania, sought to transfer her bank accounts to a Pennsylvania bank, and directed an accountant to prepare her tax returns as if she were a Pennsylvania resident.  Id. at 853-854.  She also expressed a desire to remove her belongings from her Florida apartment and to move to a nursing home in Pennsylvania.  Id. at 854.  However, the evidence showed that the decedent referred to Florida as her "home" and did not, in fact, remove her belongings from the Florida apartment, terminate her lease, or transfer her checking and savings accounts to a Pennsylvania bank.  Id.  Because the decedent's conduct was equally consistent with either the intent to change her domicile to Pennsylvania or the intent to maintain a domicile in Florida until she was certain she could not return, the court held that the proponents of the estate did not carry their burden of establishing a change in domicile by clear and convincing evidence.  Id.

Unlike the decedent in McKinley, however, Martin has not demonstrated a legitimate reason establishing why he was prevented from returning to Kentucky before his stroke in April 2020.  The present action is comparable to McKinley only insofar as Martin, like the proponents

of the decedent's estate, has failed to come forward with evidence establishing that he changed his domicile from Michigan to Kentucky in 2001.

Because Martin has not carried his burden of establishing that diversity of citizenship exists, the Court concludes that it lacks jurisdiction and dismisses the action without prejudice.

## IV.  CONCLUSION

For the reasons discussed above, the Court grants Defendants' motion to dismiss (Dkt. 120), and grants Defendants' motion for leave to file supplemental briefing (Dkt. 140).

SO ORDERED.

Dated:  March 15, 2021                                   s/Mark A. Goldsmith
       Detroit, Michigan                            MARK A. GOLDSMITH
                                         United States District Judge